Paige M. MILLER, Plaintiff,

v.

Andrew H. HULSEY, Director of the Arkansas Game and Fish Commission, et al., Defendants.

No. LR-72-C-144.

United States District Court,
E. D. Arkansas, W. D.

March 22, 1973.

William R. Wilson, Jr. of Wilson & Hodge, Little Rock, Ark., for plaintiff.

Robert V. Light, of Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

Memorandum Opinion

HENLEY, Chief Judge.

This is a suit brought by Paige M. Miller, a former employee of the Arkansas Game & Fish Commission, against Andrew H. Hulsey, Executive Director of the Commission, the Commission itself, and the individual members of the Commission. The suit arises from the fact that Miller's employment was terminated by Director Hulsey effective June 1, 1972, after he had testified in this Court under subpoena as a witness for the United States in a criminal trial in which Garland Stokes, a fellow employee

of the Commission, Billy Samuel Brown, and Lanny Green were the defendants.[1]

Those defendants were charged with having obstructed justice in this Court in violation of 18 U.S.C.A., section 1503, and with having conspired to do so in violation of 18 U.S.C.A., section 371. The charges arose out of the fact that in March 1972 the defendants had conspired to inflict serious injury on Miller, which conspiracy was carried out. Miller was lured from his home to a remote area in Crittenden County, Arkansas, where he was assaulted and brutally, nearly fatally, beaten by Stokes and Brown. The Government charged that the conspiracy was formed and carried out because Miller in 1970 had testified as a Government witness against Stokes and Brown who were tried and found guilty of violating federal game laws relating to the hunting of mourning doves.

The complaint alleges that plaintiff was discharged on account of his testimony, and that his discharge violated rights protected by the Constitution and laws of the United States. Jurisdiction is predicated upon 28 U.S.C.A., section 1343(3) and 42 U.S.C.A., section 1983. Plaintiff seeks an adjudication that his discharge was illegal under federal law. He also seeks reinstatement in his position as game warden with back pay, plus compensatory and punitive damages.

The conspiracy and obstruction of justice charges against Stokes, Brown, and Green were tried in May 1972, and the discharge of Miller took place eight days after the trial was concluded. The complaint herein was filed on June 26, 1972, after Director Hulsey had refused to grant plaintiff a hearing before the Commission. The defendants moved to dismiss the complaint; that motion was granted as to the Commission as an agency of the State but was overruled with respect to the Commissioners and Hulsey. Miller v. Hulsey, E.D.Ark., 1972, 347 F.Supp. 192.

Thereafter, the Commissioners and Mr. Hulsey filed an answer denying that plaintiff is entitled to relief. Subsequently, those defendants filed a motion for summary judgment. That motion was granted as to one Commissioner who holds his position ex officio and has no voting power; it was overruled as to the other defendants.

Thereafter, the parties agreed that the issue of whether plaintiff was unlawfully discharged might be decided by the Court on the basis of documentary material of record, including the discovery depositions of the plaintiff and of Director Hulsey. The Court has now considered the body of evidentiary material before it, and is ready to decide the issue.

Insofar as here pertinent, 18 U.S.C.A., section 1503 makes it a felony for any person to injure a federal court witness in his person or property on account of his having testified in such court or on account of the content of his testimony. 42 U.S.C.A., section 1983 gives a cause of action to any person who has suffered a deprivation of any federally protected right at the hands of another person acting under color of State law; and 28 U.S.C.A., section 1343(3) creates a federal forum for the assertion of such a cause of action regardless of the citizenship of the parties or amount in controversy.

In Miller v. Hulsey, supra, this Court held that an employee of an agency of the State of Arkansas has a right protected by 18 U.S.C.A., section 1503 and to some extent by the First Amendment to the Constitution of the United States not to be discharged merely because in obedience to a subpoena he has testified in federal court or by reason of the content of his testimony. While recognizing that section 1503 does not in itself create a private cause of action, the Court held that such a cause of action is created by section 1983. There is no question that when Mr. Hulsey dis-

---

1. Technically, Miller was suspended indefinitely without pay which suspension from a practical standpoint amounted to a discharge.

charged plaintiff, the former was acting under color of State law and authority.

█ The burden is on the plaintiff to establish by a preponderance of the evidence that his discharge was unconstitutional or amounted to a violation of federal law. The Court thinks that the plaintiff has discharged that burden.

The historical facts of this case are essentially undisputed and may be summarized as follows:

Paige Miller was employed by the Commission as a warden in 1956. In 1970 and in years prior and subsequent to that year he was stationed in Crittenden County in the extreme eastern part of the State of Arkansas. During that period of time the Commission owned or held under lease a tract of land known as Brandywine Island, which was a game management area. In 1970 and thereafter the Brandywine Island operation was in charge of Garland Stokes who has been mentioned. From time to time Miller received reports that Stokes was involved in law violations or other improper practices on the Island, and Miller relayed those reports to defendant, Hulsey.

In late 1970 the federal Grand Jury for the Eastern District of Arkansas returned two indictments charging that on October 12 and 13 of that year Garland Stokes and Billy Samuel Brown had hunted doves on Cat Island in Crittenden County in violation of federal regulations dealing with the hunting of migratory game birds. Stokes, Brown, and others had been arrested on Cat Island by State and federal officers, including Mr. Miller.

Stokes and Brown were duly tried in this Court, and Miller testified as a witness for the Government. Brown and Stokes were found guilty and were fined by the writer. The Commission took no disciplinary action with regard to Stokes.

In mid-March 1972 Stokes, Brown, and Lanny Green, who at that time was a Crittenden County Deputy Sheriff, entered into a criminal conspiracy to lure Miller from his home to a secluded spot in Crittenden County for the purpose of enabling Stokes and Brown to beat him. It was part of the conspiracy that Green would cause Miller to receive a radio message to the effect that deer were being hunted illegally near Horseshoe Lake, the idea being that Miller in reliance on the message would proceed in the night time to the designated spot where he would fall into the hands of Stokes and Brown.

The conspiracy was carried out with brutal success. Miller received the message and relied on it; he went to the designated spot in furtherance of his duties as a law enforcement officer; when he reached the spot, he was assaulted by Stokes and Brown, principally the former, and was held prisoner and beaten almost constantly for a period of several hours. At one stage of the proceedings Miller was placed in a motor vehicle and was driven from place to place on country roads. At one point on the journey the party encountered a Crittenden County Deputy Sheriff, and Miller called on him for assistance, which was refused. Miller was finally released in a seriously injured condition which required substantial hospitalization and surgery.

While there may have been a legitimate question as to why Stokes and Brown had assaulted and beaten Miller, there was never any question that they had done so, and that their acts constituted serious violations of the criminal laws of the State of Arkansas if not of the United States. Criminal charges were in fact filed against Stokes and Brown in the Circuit Court of Crittenden County but, as far as the Court knows, the case has never been tried.

Mr. Hulsey made a cursory investigation of the episode, or at least he talked to Stokes about it. However, he and the Commission decided not to take any action with respect to the incident until

the termination of the court proceedings.[2]

The day before the Commission decided not to take immediate action with respect to the beating of Miller the federal Grand Jury returned the conspiracy and obstruction of justice indictments against Stokes, Brown, and Green which the Court has mentioned. Those cases were consolidated and tried to a jury in the writer's Court from May 16 to May 23, 1972. Miller testified under subpoena as a Government witness; and his testimony related his beating to his earlier testimony in the Cat Island case in 1970. Although there was ample evidence to have justified the jury in finding all three defendants guilty, the jury after long deliberation acquitted all of them. The controlling question in that case was the motive of the defendants in kidnapping and beating Miller. On that question the evidence was conflicting, but the Court will repeat that there never was any question about what Stokes, Brown, and Green actually did.

Director Hulsey was a witness at the trial, and took a great deal of interest in the proceedings although he and the other witnesses were excluded from the courtroom under "the rule." Hulsey caused an employee of the Commission to sit in the courtroom and take notes on the testimony, which notes were passed on to Hulsey. In addition, Hulsey did a substantial amount of talking to other people in the halls outside the courtroom apparently making inquiries about the conduct of Stokes in relation to Brandywine Island and about Miller's reports about Stokes in that context.

On May 31, 1972, eight days after the termination of the trial, Mr. Hulsey sent a memorandum to both Stokes and Miller suspending them indefinitely and without pay. His memorandum assigned no reason for the action taken,

and neither man was given any prior notice of the action. On June 12 Miller requested a hearing; on June 14 his request was denied by Mr. Hulsey. Four days after the suit was filed Miller was offered a hearing, but on advice of counsel he declined the offer, the Court thinks justifiably.

When the fact of Miller's discharge became public, Mr. Hulsey was interviewed by representatives of the news media, and he told them that he had taken his action after considering the testimony taken in this Court. He also stated that he had discharged Stokes for beating Miller, and that he had discharged Miller because he had harassed Stokes to the extent that Stokes took the actions which have been described.

In their answer the defendants deny that the discharge of Miller was related to his testimony in this Court, and at an early stage of his deposition Mr. Hulsey stated that he had discharged or "suspended" Miller because he had become convinced that over a period of time Miller had lied to him about Brandywine Island and had harassed Stokes over a period of some three years. Another reason given by Hulsey was that on one occasion Miller had told him that he did not want to become a supervisor whereas he actually desired such a position.

When asked why he did not suspend Stokes when he learned of the beating of Miller, Mr. Hulsey stated in substance that he interviewed Stokes to get his version of the incident; that his conversation left him in a state of doubt about ultimate blame for the affair; that he related it to the overall Brandywine Island "problem," and decided to do nothing until charges growing out of the assault on Miller should be disposed of. Attached to his deposition as an exhibit is an excerpt from the minutes of a meeting held by the Commission on

---

2. Miller filed a civil suit against Stokes, Brown and others in the United States District Court for the Jonesboro Division of the Eastern District of Arkansas over which District Judge Garnett Thomas

Eisele normally presides. The case was tried to near conclusion by Judge Eisele and a jury in February of this year, but due to the illness of a juror a partial mistrial had to be declared.

April 17 and 18, about a month after the assault, which indicates that the Commission went along with Mr. Hulsey's determination.

Just as the jury was concerned in 1972 with the question of why Miller was beaten, so here, the Court is concerned with the question of why Mr. Hulsey discharged Miller. That question must be answered ultimately by inference; the Court is required to consider Hulsey's act itself, the facts and circumstances leading up to, surrounding and following it, and his explanations of his act. In resolving the question the Court is well aware of the fact that a causal connection between two events does not necessarily exist simply because one closely follows the other in point of time; however, the time element is a factor to be considered along with everything else.

In determining whether Miller was discharged on account of his testimony at the May 1972 trial it will be helpful to consider certain possible alternative reasons for his termination. The Court finds that he was not discharged because he was not a good and efficient law enforcement officer; no claim has ever been made that he was other than that. Indeed, the evidence is to the contrary, and in fact Mr. Hulsey himself has commended Miller for his work. There was nothing in the content of his testimony that would afford grounds for his discharge; that is to say, he did not in the course of his testimony admit that he had been guilty of any wrongdoing, or that he had lied about Stokes or any other Commission employee. It is true that he relayed to Mr. Hulsey reports that he had received about what was going on on Brandywine Island, but it was his duty to do that. Mr. Hulsey deposed that he discharged Miller for the main reason that he did not believe that Miller believed that the reports that he relayed were true, but Mr. Hulsey was not able to give any logical reason for his disbelief or for his belief that Miller had harassed Stokes. While Mr. Hulsey said that he had "agonized" over the Brandywine Island situation for some two years before the beating of Miller, it does not appear to the Court that Mr. Hulsey ever made any vigorous effort to find out what was going on on the Island and simply hoped that the problem would go away. He stated that he could not determine prior to the 1972 trial whether Miller was lying or whether Stokes was lying, and the Court does not believe that he suddenly saw the light as a result of his consideration of the testimony in that trial. Hulsey's claim that one reason that he terminated Miller was that Miller had falsely told him on one occasion that he did not desire a promotion does not merit any serious consideration; neither does Hulsey's suggestion that Miller's termination was due in part to the fact that he had not returned some borrowed Commission equipment some 15 years before his discharge.

█ What, then, is left? It is clear that prior to the 1972 trial Miller was not in any danger of being terminated, at least immediately, assuming that he would be able to go back to work after the brutal beating that he had received. Mr. Hulsey concedes that in coming to his conclusion to discharge Miller he considered the testimony at the trial. And the Court finds that the disclosures at the trial were the precipitating factor that led to the discharge of Miller and the belated discharge of Stokes. In that connection it appears to the Court that Mr. Hulsey and perhaps his superiors came to the conclusion that notwithstanding the acquittal of Stokes on the federal charges against him, he could no longer be continued in employment, and that Hulsey took what seemed to him to be the easy way out, i. e. he discharged both men.

The Court does not think that a valid distinction can be drawn between the trial of Stokes, Brown, and Green, and the testimony that Miller gave at that trial. His testimony was vital to the Government's case. Without it there would have been no trial, and many of the disclosures that may have been em-

barrassing to the defendants came from Miller.

In dealing with defendants' motion to dismiss the complaint the Court felt that it should assume that plaintiff's discharge was motivated in substantial part by a desire on the part of the defendants to punish him for having testified, that the discharge was in retaliation for his action in testifying, and that had he not testified he would not have been terminated. 347 F.Supp. at 196. The Court thinks that for purposes of the motion it may have assumed somewhat more than it was legally required to assume.

■ The Court thinks that it may be possible that Mr. Hulsey was not thinking in terms of "punishment" or "retaliation" when he discharged Miller. It may well be that he thought that he simply had an intolerable situation on his hands, and that the best way out of it was to terminate both Miller and Stokes. But, the Court does not consider that Hulsey's subjective characterization of his action is of controlling importance here. The fact remains that on account of his having testified in this Court Miller lost his job, which was as much punishment as it was in the power of Hulsey to inflict. This is not a criminal case, and plaintiff is not required to show malice or a specific intent to deprive him of a federally protected right. Monroe v. Pape, 1961, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492.

■ It follows that plaintiff is entitled to relief in this action which will include reinstatement to his position with back pay and an injunction prohibiting any discrimination against him on account of his testimony in this Court.

The Court is aware that the issue of damages has not been submitted to it, but the Court feels that it should say some things about damages which may bring this litigation to a conclusion at this level without the introduction of any further evidence.

Plaintiff, of course, is not entitled to compensation in this action for the injuries inflicted upon him by Stokes and Brown. And the Court thinks that reinstatement with back pay will adequately compensate him for his discharge and will vindicate him in the public eye, if he needs vindication. How long he will care to remain in the employ of the Commission the Court does not know.

As to punitive damages, the Court will say that it would not award such damages on the present record or on any additional record at all likely to be made in the case. While the Court is convinced that Mr. Hulsey and the Commissioners, at least sub silentio, inflicted a legal wrong on plaintiff, the Court does not find and is not likely to find that any of the defendants acted with malice or with any personal animus toward Miller.

Apart from Miller's ultimate discharge, the sins of the defendants have been more of omission than of commission. In the course of his deposition Mr. Hulsey stated that when he became Director in 1969 the Commissioners made it clear to him that they did not want him to take any drastic action with respect to personnel problems that had been vexing the agency, and that he was supposed to wipe the slate clean and let bygones be bygones. No substantial effort was made to clear up the Brandywine Island situation. Stokes was not disciplined as he should have been when he was convicted of a federal game violation; and he was not disciplined or discharged as he should have been when the Commission learned of the assault on Miller. It is unfortunate that after the conviction of Stokes in 1970 he and Miller were left assigned to duty in close proximity to each other; from that action trouble between the two men was clearly foreseeable, and trouble certainly occurred.

The Court will file this opinion but will withhold entry of final judgment for a period of five days. Unless within that period of time counsel for plaintiff advises the Court that his client wants to introduce evidence on the matter of damages the Court will enter a judg-

ment declaring that plaintiff's discharge was illegal, directing his reinstatement with back pay, enjoining future discrimination against him, and taxing costs in his favor.